UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

PORTS OF INDIANA,            )
                             )
       Plaintiff,            )
   vs.                       ) NO. 1:09-cv-00854-TWP-MJD
                             )
LEXINGTON INSURANCE COMPANY, )
                             )
       Defendant.            )

### ORDER

This matter comes before the Court on Plaintiff Ports of Indiana's (the "Ports") *Daubert* Motion to Exclude Certain Expert Opinions of Lexington's Experts, John O'Leary and Michael Garlich [Dkt. 56], the Ports' *Daubert* Motion to Exclude or Limit the Supplemental Expert Opinions of John O'Leary and Michael Garlich [Dkt. 120], and Defendant Lexington Insurance's Motion to Bar David Christopher Wilbourn From Providing Expert Testimony and Opinion. [Dkt. 79]. The Court held a hearing on the matter on August 18, 2011. For the reasons discussed below, pursuant to Rule 72(a) of the Federal Rules of Civil Procedure,[1] the Court issues the following Order **DENYING** these motions.

### I. BACKGROUND

This case involves an insurance claim brought by the Ports for damage sustained to the wall of a dock it operates in Burns Harbor, Indiana on the west side of the dock referred to as the West Harbor Arm. Defendant Lexington issued a property insurance

---

[1] This Order is issued pursuant to Fed. R. Civ. P. 72(a) because the motions addressed herein are not among those motions excepted from determination by a Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A).

policy to the Ports on the dock covering the period from October 1, 2007 and October 1, 2008 (the "Policy"). In January 2008, a portion of the dock wall at or around Bollard #7 was damaged. Following the failure at Bollard #7, both the Ports and Lexington retained consultants to inspect the damage to the dock wall. Initially, both parties' consultants agreed that there was damage to this area of the dock consisting of approximately 128 linear feet, and Lexington paid the Ports over $1.2 million for the replacement of the damaged area pursuant to the Policy. The Ports later contended that the entire dock wall had failed during the Policy period and the remaining 1,864 feet needed to be replaced or repaired. Lexington denies that the remainder of the dock wall outside of Bollard #7 sustained damage or failed during the Policy period.

### A. Lexington's Experts

John O'Leary and Michael Garlich are engineers with Collins Engineering that were hired by Lexington in 2009 to do a comprehensive inspection and analysis of the dock after the Ports insisted that there was additional damage to the dock wall. O'Leary is a structural engineer and Garlich is a geostructural engineer, both of whom are licensed in Indiana and have experience with the analysis and design of underwater structures, including dock walls. O'Leary and Garlich performed the majority of the investigation and analysis for Collins, which included

several site visits in 2009 and 2010, where they inspected the top of the dock wall, apron, pavement and the sheet piling wall, and performed underwater inspections.  Lexington has named O'Leary and Garlich as experts in this case to testify as to the cause and extent of the damage to the dock wall.  The Ports seeks to exclude the expert opinions of O'Leary and Garlich pursuant to Rules 402, 403 and 702 of the Federal Rules of Evidence.  The Ports also seeks to exclude supplemental testimony of Garlich and O'Leary under Rule 26(e) for failure to timely supplement their expert disclosures, as well as under Rule 702.

**B. The Ports' Expert**

Wilbourn is a licensed engineer with a bachelor's degree in civil engineering and has worked for Garver LLC, an engineering firm, for thirty years.  Wilbourn has worked with the Ports on several projects dating back to 1986.  Most recently, Wilbourn designed the rehabilitation and restoration work for the dock wall.  The Ports identified Wilbourn as an expert to testify regarding the condition of the dock wall; specifically, that the wall has suffered physical damage and permanent rotational deformation.  Lexington seeks to exclude the expert opinions of Wilbourn pursuant to Rules 402, 403 and 702 of the Federal Rules of Evidence.

**II. LEGAL STANDARD**

The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The court's role in applying Rule 702 is that of "gatekeeper" to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Under Rule 702 and *Daubert*, the district court must determine (1) whether the witness is qualified; (2) whether the expert's reasoning or methodology is scientifically reliable; and (3) whether the testimony will assist the trier of fact to understand the evidence or to determine a fact at issue. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (citing Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592-93).

In order to determine reliability, the court should determine whether the expert is qualified in the relevant field

4

and must examine the methodology that the expert has used in reaching his conclusion. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). An expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. In its role as gatekeeper, the district court has a great deal of discretion to determine both "the method by which the reliability of the proposed expert testimony will be measured and whether the testimony is, in fact, reliable." *Jenkins v. Bartlett,* 487 F.3d 482, 489 (7th Cir. 2007). However, "the soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Ford Motor Co.*, 215 F.3d at 718.

In determining whether an expert's testimony is relevant, the question for the court is whether the testimony will assist the trier of fact of any of the issues involved in the case. *Ford Motor Co.*, 215 F.3d at 718. Experts are allowed to present alternative models to explain their conclusions and such testimony is relevant so long as the expert's hypothetical explanation of the possible or probable causes of an event would aid the jury in its deliberations. *Id*; *Walker*, 208 F.3d at 589-90.

When an otherwise qualified expert's testimony is based upon sound methodology, questions about the expert's opinion go to the

5

weight of the expert's testimony, not its admissibility. "The proper method of attacking evidence that is admissible but subject to doubt is to cross-examine vigorously, to present contrary evidence, and to give careful instructions on the burden of proof." *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000); *see also Daubert*, 509 U.S. at 596. The focus of the court's inquiry is upon whether the expert testimony is pertinent to an issue in the case and the principles and methodologies underlying the testimony, not upon the conclusions they generate. *Daubert*, 509 U.S. at 595; *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 159 (Scalia, J., concurring).

### III. DISCUSSION

**A. Lexington's Experts**

The Ports does not question the qualifications of O'Leary and Garlich; rather it primarily takes issue with O'Leary's and Garlich's methodology. Specifically, the Ports challenges the relevancy of facts and data underlying Lexington's experts' opinions and the reliability of the methodologies employed in reaching their conclusions.

**1. Reliability of Methodology**

The Ports argues that Lexington's experts' testimony is unreliable because the underlying data used in their analyses is faulty. The Ports claims that Lexington's experts disregarded relevant data and utilized unsupported assumptions, thus

rendering their opinions unreliable. The Ports claims that Lexington's experts used different water level measurements from those that existed when the damage to the dock wall occurred in performing their parametric analysis and used data they gathered in 2009 and 2010 to do an alignment analysis, which constitutes "cherry picking" of data rendering their opinions unreliable.

With regard to the variables used in the parametric analysis, it cannot be concluded that Lexington's experts improperly used incorrect data such that their testimony would not be reliable and thus inadmissible. The Ports argues that Garlich's parametric analysis is the "lynchpin" of all of the opinions expressed by both Garlich and O'Leary; however, a view of the entire Collins report, as well as the deposition testimony, show that Garlich and O'Leary reviewed and relied upon a wide variety of data to reach their conclusions regarding the damage to the dock wall, including data gathered by the Ports' experts both during and prior to the policy period. Experts are not required to rely solely upon the data personally collected by them and may rely on outside data so long as it is the type of data ordinarily relied upon by experts in the field. *See U.S. v. Lundy*, 809 F.2d 392, 395 (7th Cir. 1987) ("[E]xperts are given special latitude to testify based on hearsay and third-hand observations.") Garlich explained in his deposition that the parametric analysis is designed to look at the long term

7

stability assessment of the dock wall by inputting variables into a computer model; it was a hypothetical analysis of conditions that the dock was subjected to over time. [Dkt. 57-10, Garlich Deposition at 60:11-23]. Garlich stated that the purpose of running this analysis is not to determine the condition of or damage to the dock wall, but rather that the parametric analysis relates only to the stability of the wall system as designed. [*Id.* at 123:9-12]. The Ports own expert, Robert Lukas, testified that the parametric stability analysis is only an indication of whether there was a sufficient safety factor, it is not an indication of damage. [Dkt. 57-5, Lukas Deposition at 269:13-23]. The ultimate purpose of Collins' investigation was to determine whether there was actual damage that occurred to the dock wall during the period covered by the Policy, not the potential for failure measured by the factor of safety. It is clear from the Collins report that Garlich and O'Leary did not reach their conclusions solely upon the basis of the results of the parametric stability analysis, and the Ports puts undue emphasis on this portion of their evaluation. Thus, the Court finds that Garlich's and O'Leary's methodologies are sufficiently reliable such that they should not be excluded from testifying.

   **2. Relevancy of Opinions**

The Ports also argues that the opinions of Garlich and O'Leary are not relevant because they do not specifically relate

to the policy period.  The Ports heavily emphasize that Garlich and O'Leary used design water level data in their parametric analysis and elevation measurements from after the time period in which the damage to the dock wall occurred, and ignored relevant data from 2008 which would have yielded a different outcome in their analysis.  The fact that Collins used data from a time period after the damage had already occurred, as repeatedly stressed by the Ports, does not automatically render their opinions irrelevant, since damage that would have occurred in 2008 during the policy period would necessarily still exist when Collins did their inspection in 2009 and 2010, prior to repair of the dock.  The damage that occurred in 2008 would not have magically rectified itself in that period of time solely based upon the change in water levels.  The actual existence of damage is more relevant than the potential for damage to occur, which is what was measured in the stability analysis.

In addition, as noted above, the purpose of Garlich's parametric analysis was not to measure the dock wall during a specific period of time, but rather the performance of the dock wall over an extended period of time in order to test whether the dock was adequately designed.  Both Garlich and the Ports' expert, Robert Lukas, performed parametric stability analyses using industry accepted methods, but merely chose to input different variables and constants into their computer models.

9

This alone does not render Garlich's testimony inadmissible based upon irrelevancy, and the Ports may challenge his opinion by means of cross examination and presentation of contrary evidence at trial.  *See Daubert*, 509 U.S. at 596.  The Court finds that Garlich's and O'Leary's testimony is also relevant in this case.

### 3. Admissibility of Supplemental Opinion

The Ports also seeks to bar the supplemental expert opinions of Garlich and O'Leary on the basis that the supplemental report was untimely, that the supplemental opinions are inadmissible under *Daubert*, and that the experts are not qualified to opine on dips and depressions along the surface of the dock wall.  Rule 26(e) requires a party who has made a disclosure under Rule 26(a) to supplement or correct its disclosure in a timely manner if the party learns that the disclosure is incomplete or incorrect in some material respect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process.  Fed. R. Civ. Pro. 26(e).  "The obligation to supplement disclosures…applies wherever a party learns that its prior disclosures…are in some material respect incomplete or incorrect.  There is, however, no obligation to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process." Fed. R. Civ. Pro. 26, advisory committee's note.

Lexington's experts were not under an obligation to supplement their expert disclosures, and in any event such supplemental reports were not untimely. The first time the Ports brought up the existence of deformed walers was at John Hughes' deposition in August, 2010, which occurred after Lexington's expert disclosure deadline. At that time, the Ports had not disclosed Hughes as an expert. Following the Hughes deposition, Lexington repeatedly sought to inspect the damaged walers, but were met with opposition from the Ports and told that the walers had already been covered up in the construction process. Photographs of the walers were not sent to Lexington until December 2010 and January 2011. The first time Lexington's experts had the opportunity to inspect the walers was on January 7, 2011, and the only ones available for inspection were between Bollards 14 and 15, with additional inspections taking place on January 27, 2011 and February 15, 2011 between Bollards 15 and 17. On January 26, 2011, Hughes again testified about the bent walers and the alleged cause of the deformities. However, at no time did the Ports supplement their expert disclosures to mention the walers. Lexington submitted their supplemental report less than three weeks after the last waler inspection and within thirty days of Hughes' deposition. The Ports cannot be allowed to question the timeliness of Lexington's experts' reports when the delay, if any, was caused by the Ports itself.

With respect to the opinions regarding dips and depressions, Rule 26(e)(1)(A) does not require O'Leary to file a supplemental report.  The Ports was made aware of Lexington's intent to have their experts opine on the subject of dips and depressions along the dock wall in the discovery process, specifically in Lexington's answers to interrogatories in November 2010, thus negating the requirement that they supplement their expert disclosure report.  However, even assuming that O'Leary was required to supplement his expert report, O'Leary's supplemental affidavit regarding dips and depressions was submitted shortly after he received deposition testimony and pertinent survey data on the subject from the Ports' expert, DLZ, which it had been requesting from the Ports for several weeks.  Thus it cannot be said that O'Leary's supplemental report was untimely.

The supplemental testimony by Garlich and O'Leary are admissible under Rule 702 and *Daubert* for the same reasons that their other expert testimony is admissible.  Both Garlich and O'Leary are qualified to render opinions on dips, depressions and uneven elevations based upon their respective backgrounds and experience with dock walls.  It is not necessary for experts to conduct their own surveys and measurements in order to be qualified to render an expert opinion on the subject.  Garlich and O'Leary based their opinions not only on the data that they

personally gathered, but on data collected by the Ports' own experts as well.

### A. The Ports' Expert

Lexington challenges the admissibility of testimony of the Ports' expert, Wilbourn, on the basis of both reliability and relevancy. Specifically, Lexington asserts that Wilbourn is not qualified to provide his expert opinion, that his opinions are not founded upon a reliable methodology, and that his opinions are not relevant because they will not assist the trier of fact in determining the condition of the dock wall.

#### 1. Reliability of Testimony

Lexington first argues that Wilbourn's testimony is not reliable because Wilbourn is not qualified to provide the expert opinions at issue. [Dkt. 80 at 11]. Lexington contends that Wilbourn is not a forensic engineer, i.e. he does not evaluate structures to determine if they have failed or why they have failed, and that he has no experience inspecting dock walls to determine their condition. In response, the Ports argues that Wilbourn is qualified to testify regarding the construction and condition of the dock wall based on his thirty years of experience as an engineer who has designed and analyzed dock walls identical to the one at issue in this case. [Dkt. 105 at 9]. Moreover, as the Ports points out, in designing the rehabilitation work at the dock wall, Wilbourn had to assess the

13

condition of the existing dock wall to determine the extent of the work that needed to be done and to determine which portions of the dock wall could be incorporated into the rehabilitation design.  Given Wilbourn's experience as an engineer and his familiarity with the dock wall at issue, including designing the rehabilitation work for the dock wall, the Court finds that Wilbourn is sufficiently qualified to testify as an expert in this case.

Lexington next argues that Wilbourn's opinions are not reliable because his opinions are not founded on reliable principles or methods.  [Dkt. 80 at 11].  According to Lexington, Wilbourn's testimony lacks reliability because he did not base his testimony on sufficient facts or data.  For example, Lexington argues that Wilbourn conducted no inspections of the dock wall, has not performed his own analysis of the dock wall, and has reviewed almost nothing relating to the condition of the dock wall.  The Ports argues that Wilbourn's methodology is sound and based on his experience, information about the site that Wilbourn gathered, and the results of his own stability analysis.  [Dkt. 105 at 9].

The fact that Wilbourn did not visit the site does not prevent him from offering testimony as an expert.  An expert may base his or her opinions on facts or data "made known to the expert at or before the hearing."  Fed. R. Evid.  703.  Lexington

14

argues that, rather than forming his own opinions, Wilbourn essentially parrots Ports Director of Engineering John Hughes' opinions. While Wilbourn may have relied on information provided by Hughes, there is no indication that Wilbourn is merely parroting Hughes' opinions.

At his deposition, Wilbourn testified that he considered a number of factors including the low lake levels that caused the wall to experience the highest load in its life, the groundwater behind the wall, and the hydrographic survey that showed scour[2] along the wall. [Dkt. 106-1, Wilbourn Dep. 157:19-160:6]. Wilbourn also testified that he believed that the dock wall's factor of safety had decreased, in large part, because of the scour at multiple locations along the wall. [*Id.* at 103:7-14]. Wilbourn went on to state that "I definitely know just from the physical hydrographic surveys the factor of safety is compromised." [*Id.* at 105:14-16]. Contrary to Lexington's assertions, Wilbourn considered facts and data from the site and used that information to form his opinions. Given Wilbourn's experience, his knowledge of the dock wall in question, and the factors he considered in forming his opinions, the Court finds Wilbourn's testimony sufficiently reliable.

The Ports argues that Lexington's objections to Wilbourn's testimony go to the weight and not the admissibility of

---

[2] Scour is the erosion tof the channel bottom material.

15

Wilbourn's testimony. [Dkt. 105 at 15]. The Court agrees. Wilbourn's credibility as an expert will be determined by the jury and Lexington will have ample opportunity to cross-examine Wilbourn regarding his conclusions and the facts on which his opinions are based. *See Smith*, 215 F.3d at 719. Ultimately, the jury will decide Wilbourn's credibility as an expert.

### 2. Relevancy of Testimony

Lexington argues that Wilbourn's testimony will not assist the trier of fact because his opinions are based on assumptions and conclusions told to him by Hughes. [Dkt. 80 at 14]. In response, the Ports argues that Wilbourn's opinions are relevant to whether the dock was completely undamaged in areas beyond Bollard 7. Wilbourn's opinions would likely assist the jury in determining whether the entire dock wall was damaged. As mentioned previously, there is no indication Wilbourn is parroting Hughes and Wilbourn's opinions are based on more than assumptions and conclusions as evidenced by his deposition testimony regarding the factors he considered. Accordingly, the Court finds that Wilbourn's testimony is relevant to a fact at issue in the case.

### VI. CONCLUSION

For the foregoing reasons, the Ports' *Daubert* Motion to Exclude Certain Expert Opinions of Lexington's Experts, John

16

O'Leary and Michael Garlich [Dkt. 56], the Ports' *Daubert* Motion to Exclude or Limit the Supplemental Expert Opinions of John O'Leary and Michael Garlich [Dkt. 120], and Defendant Lexington Insurance's Motion to Bar David Christopher Wilbourn From Providing Expert Testimony and Opinion. [Dkt. 79] are hereby **DENIED**.

Dated: 09/16/2011

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution List:

Jonathan K. Barger
BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP
jbarger@butlerpappas.com

Brandi L. Bennett
ICE MILLER LLP
bennett@icemiller.com

Michael E. Brown
KIGHTLINGER & GRAY
mbrown@k-glaw.com

Victoria Redstone Calhoon
ICE MILLER LLP
victoria.calhoon@icemiller.com

Brent W. Huber
ICE MILLER LLP
brent.huber@icemiller.com

Ginny L. Peterson
KIGHTLINGER & GRAY
gpeterson@k-glaw.com

K. Clark Schirle
BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP

```
cschirle@butlerpappas.com

Michael P. Sever
BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP
msever@butlerpappas.com
```