UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

PORTS OF INDIANA,                         )
                                          )
          Plaintiff,                      )
                                          )
          v.                              )        Case No. 1:09-cv-0854-TWP-MJD
                                          )
LEXINGTON INSURANCE COMPANY,   )
                                          )
          Defendant.                      )

ENTRY ON MOTIONS FOR SUMMARY JUDGMENT AND APPEAL OF
MAGISTRATE JUDGE'S ORDER

Ports of Indiana ("Ports") is a statewide port authority created by legislation to operate

Indiana's system of inland ports.  Burns Harbor Port on Lake Michigan is the largest seaport

operated by Ports.  In either late December 2007 or early January 2008, the east dock wall on the

west arm of the Burns Harbor Port suffered visible damage.  Lexington Insurance Company

("Lexington") provided the commercial property coverage for the Burns Harbor Port during that

time period.  Lexington agrees that the dock wall in the area of Bollard #7[1] was damaged.[2]

Pursuant to the insurance policy, Lexington paid Ports $1.2 million to repair that portion of the

wall.  This payment, however, did not end the matter.  As of today, Ports and Lexington still

disagree on several issues, including: (1) whether additional sections of the dock wall were

damaged; (2) the cause of the damage; and (3) whether the dock wall was damaged as a result of

more than one "occurrence."  These issues are at the center of the present lawsuit.  This  matter is

---

[1] A "bollard" is an anchored vertical post in a dock wall used to allow ships to "tie off."

[2] Lexington agrees that the dock wall around Bollard #7 was physically damaged insofar as it failed when the "toe," or bottom of the sheet piling that constitutes the outer dock wall, kicked out almost two feet, resulting in the concrete paving of the dock apron in that area to have large depressions, including one sinkhole that was two to three feet deep, ten feet wide, and seventy feet long.

before the Court on three pending motions: (1) Ports' Objections to and Appeal from the Magistrate Judge's September 16, 2011 Order on Daubert Motions (Dkt. #158); (2) Ports' Motion for Summary Judgment (Dkt. #64); and (3) Lexington's Motion for Partial Summary Judgment on the Issue of the Number of Occurrences (Dkt. #62).   For the reasons set forth below, Lexington's Motion for Partial Summary Judgment, Dkt. #62, is **GRANTED**.   Ports' Motion for Summary Judgment, Dkt. #64, is **DENIED** and Ports' appeal to the Magistrate Judge's Order, Dkt. #158, is **DENIED**.

## I.  BACKGROUND

This lawsuit arose when plainly visible damage to the dock wall and apron near Bollard #7 caused Ports to investigate the wall's viability across its entire length.   According to Ports, their investigation unearthed further damage across a greater span of the wall.   Ports argues that while the damage beyond the area of Bollard #7 may not have been as plainly visible as the sinkhole that had developed near Bollard #7, it was *damage* nonetheless.   According to Ports, the cost of repairing those sections should be a covered loss under the policy Lexington.

Ports' contention that the damages to the dock wall spanned nearly 2,000 lineal feet is based on both underwater and above water investigations by numerous consultants.   Robert G. Lukas ("Lukas"), an engineering consultant with Ground Engineering Consultants, Inc., was retained by Ports to evaluate the dock wall and provide expert testimony.   Lukas reviewed the original design drawings, various underwater inspection reports, above ground measurements, and historical water and dock data.   Based on this analysis, Lukas reached a number of conclusions in his June 2010 report and provided the following opinions:   first, after Lake Michigan's water level dropped to near record lows in December 2007, the mud level in front of

2

the dock dropped below design level, likely due to the erosion of soil at the underwater base of the dock[3] caused by the force of the thrusters or propellers of ships when engaged while afloat at the lower lake water level.  Second, the groundwater level behind the dock had risen over time from where it had been when the dock was first designed to somewhere near nine feet above the lake water level, reducing the dock's stability factor of safety.[4]  Third, the dock was designed with a marginal but adequate factor of safety, as long as the mud level remained at the design level and the ground water level on the land side of the dock remained only a few feet above lake level.  Fourth, the elevation levels of the pavement on the dock apron revealed that settlement had occurred due to lateral displacement of the toe of the sheeting.  And fifth, lateral displacement of the sheeting south and north of Bollard #7 increased with time to the point where "a failure condition is imminent and these portions of the dock need to be replaced."  Ports has contracted to replace or repair sections of the dock wall both north and south of the Bollard #7 area and the bulk of that rehabilitation project has been completed.

At this point, Ports has spent more than $9 million on dock repair and replacement costs, and is expected to spend nearly $2.5 million more to complete the rehabilitation.  Thus, the total cost of the replacement and rehabilitation is roughly $11.5 million.  Notably, the Lexington policy is a $10 million per "occurrence" policy.  Ports contends that because more than one "occurrence" is at issue, Lexington is barred from applying the $10 million per occurrence limitation.

---

[3]The experts in this case also refer to this phenomenon as "scour."

[4] The "factor of safety" describes the level of safety as it relates to the global stability of the soil wall system.  A value above 1 indicates that a stability failure is unlikely to occur and, according to at least one of the experts employed for this case, docks are typically designed to achieve a factor of safety larger than 1.5.

Relying on its own experts, Lexington maintains that, other than the wall and apron section near Bollard #7, the dock did not sustain "direct physical loss or damage" and was not compromised.  Specifically, the evidence supports a finding that only an area of approximately 128 feet of the dock wall failed and was damaged such that it required repair.  Therefore, Lexington claims it has no obligation to pay for work performed on other portions of the dock.  Further, to the extent that Ports' investigation of the entire length of the west arm of the port uncovered additional areas where the wall was weakened, those weaknesses did not cause a failure and did not constitute the type of "direct physical loss of or damage to" the insured property that is covered by the policy.  Finally, Lexington maintains that any insured loss was the result of only a *single* occurrence.

Ports brought this lawsuit in the Marion County Environmental Court, seeking "declaratory relief, compensatory and other consequential damages ..."; Lexington removed the matter to this court and both parties have pursued discovery and zealously litigated the issues arising to date.

## II. <u>DISCUSSION</u>

To reiterate, three motions are at issue.  Because a ruling on Ports' objections to the Magistrate Judge's ruling denying Ports' *Daubert* motions could affect the ruling on Ports' summary judgment motion, the Court will first address the objections.  From there, the Court will address Ports' motion for summary judgment, which seeks a judgment in its favor based on contentions that: (1) the dock wall sustained fortuitous physical damage; (2) no exclusions to Lexington's coverage are applicable; and (3) the costs Ports has incurred to date, and will incur in the future, are recoverable as replacement costs under the policy.  Finally, the Court will

4

address Lexington's motion for partial summary judgment, which seeks a ruling that all of the alleged damage to the dock wall was the result of a *single* occurrence.

**A.      Objections to Magistrate Judge's Order On *Daubert* Motions (Dkt. #158)**

Ports asks that the Court overturn the Magistrate Judge's order denying Ports' *Daubert* challenge.  Simply stated, this expert testimony is important.  In fact, if Lexington's expert testimony were deemed inadmissible, it could be a game-changer in terms of Ports' summary judgment motion.  But, in the end, this is a non-issue.  As discussed below, the Court finds that the Magistrate Judge reached the appropriate conclusions.

The Court's review of a magistrate judge's order is governed by Fed. R. Civ. P. 72(a), which provides:  "The district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate's order found to be clearly erroneous or contrary to law."  Using the clear error standard, the Court sustains the objections "only if [it] is left with the definite and firm conviction that a mistake has been made."  *Weeks v. Samsung Heavy Indus., Ltd.*, 126 F.3d 926, 943 (7th Cir.1997).

Following an oral argument held on August 18, 2011, Magistrate Judge Mark J. Dinsmore entered an order (Dkt. #156) denying the motions of both Ports and Lexington, each seeking to bar the other's expert from testifying at trial.  Ports sought to bar the testimony of Lexington's experts, John O'Leary ("O'Leary) and Michael Garlich ("Garlich"), for a plethora of reasons.  Most of those reasons were related either to the timeliness of the disclosure of their opinions or the reliability of their methodology in light of alleged inaccuracies in their underlying data.  The Magistrate Judge found that O'Leary and Garlich were qualified and their methodology was sufficiently reliable and relevant to allow them to testify.  He also found that

their supplemental opinions were timely in light of the delay imposed by Ports in allowing the experts to conduct certain inspections necessary for them to respond to issues which were not brought to the fore by Ports until a deposition of a key Ports witness late in the discovery schedule.

Ports objects to the Magistrate Judge's decision on eight different grounds, claiming that the Magistrate Judge ignored five arguments and made three erroneous conclusions. Those objections are as follows:

1.  The Order does not address Ports' arguments that O'Leary and Garlich improperly assumed the fact that they set out to prove – that the walers were deformed during construction in the 1960's rather than sometime thereafter – when they assumed as part of their analysis that the walers in question were deformed before they were connected to the tie rods during construction.

2.  The Order does not address Ports' arguments that O'Leary and Garlich's supplemental opinions improperly opine about the condition of the entire 1,867 feet of dock wall at issue, based on measurements, photos, and data gathered from very small sections of the wall north of Bollard #14, in areas where it cannot be disputed that the sheet piles are longer, the soil is stronger, and the conditions are materially different than in other sections of the wall.

3.  The Order does not address Ports' arguments that O'Leary's and Garlich's supplemental opinions are based on data and field notes taken from the dock wall north of Bollard #14 when this wall was partially disassembled, such that all load from the groundwater and soil behind the wall above the tie rods had been removed, and the entire section of the wall between each bollard above the tie rods had been cut away as part of the rehabilitation of the dock, thereby leaving it in a condition irrelevant to the time period in question.

4.  The Order does not account for the error in methodology employed by Mr. O'Leary when he compared alignment measurements of the dock wall between 2009 and 2010, which guaranteed that he would not find movement of the wall during the policy period, because he was only measuring the extent to which there was additional movement in the wall after the policy period, after lake levels, channel bottom elevations, and other conditions normalized.

5.  The Order does not address the prejudice inflicted on Ports by the late disclosure of Lexington's supplemental expert opinions; instead, it erroneously concludes

that Ports cannot question the timeliness because Ports caused those experts to be delayed in obtaining necessary inspections.

6.     The Order misinterprets both parties' expert witnesses' testimony about the parametric stability analyses performed in this case, mistakenly concluding that the purpose of the analysis was only to determine whether the dock wall was designed properly. In fact, the parties' experts were using a parametric stability analysis to assess structural damage to the wall, wall stability, toe failure, and "risks of" damage.

7.     The Order erroneously concludes that the cherry-picked data used by Garlich and O'Leary in formulating their first expert opinions did not render their opinions unreliable or irrelevant because they ignored relevant (and contrary) data gathered during the Policy period, while the damage was occurring.

8.     The Order mistakenly concludes that O'Leary and Garlich are qualified to offer expert opinions on dips, depressions, and elevation changes along the dock wall.

Federal Rule of Evidence 702 and the Supreme Court decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1973) provide the framework for an analysis of the admissibility of expert testimony. Applying this framework, courts must undertake a three-step analysis: the witness must be qualified "as an expert by knowledge, skill, experience, training, or education"; the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and the testimony must assist the trier of fact to understand the evidence or determine a fact in issue. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir.2007). It is this Court's obligation to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. "The *Daubert* standard applies to all expert testimony, whether it relates to an area of traditional scientific competence or whether it is founded on engineering principles or other technical or specialized expertise." *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir.2000) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)). That said, the trial court's gatekeeping role should not be interpreted in

an overly demanding manner.   If the scientific methodology employed is sound and the testimony otherwise relevant and helpful, any doubt that remains as to the correctness of the opinion is best addressed through cross-examination, presentation of contrary evidence, and the careful instruction of the jury.  *Smith,* 215 F.3d at 718; *Cooper v. Carl A. Nelson & Co.,* 211 F.3d 1008, 1021 (7th Cir. 2000).

**#1 - Assumption that walers were deformed during original construction**

During the course of Ports' rehabilitation of the dock wall, it excavated down to reveal the steel walers (a/k/a wales), which are a part of the tie-rod system supporting the sheet piling driven into the lake bed to create the dock wall.  Ports brought the condition of the walers to Lexington's attention, stating that this was further evidence of damage to the adjacent wall sections.  Lexington had O'Leary and Garlich investigate and, as a result of their investigation, they produced a supplemental expert report in which they offered the following conclusions:

- The observed distortion of the existing wales occurred during the original construction in the late 1960's.  There is no evidence that any distortion of the existing wales occurred after the original construction was completed.

- The observed distortion in the existing wales did not compromise the structural integrity of the existing wall.

- Field observations indicate that distortion is present in the new wales.

- Field observations indicate that the horizontal alignment of certain sections of the existing sheet piling were not in a straight line.

- Field observations indicate that the horizontal alignment of certain sections of the new sheet piling were not in a straight line.

- The steel sheet piling along the West Harbor Arm dock wall was not constructed perfectly plumb during the original construction in the late 1960's.   The inclination of the existing sheet piling showed a consistent slope toward the water.

- The inclination of the new sheet piling showed a consistent slope toward the water.

8

- The observed inclination and misalignment of the existing steel sheet piling does not reduce the structural resistance of the existing dock wall.

- No physical distress or damage was observed in the existing dock wall components.

O'Leary and Garlich reached the conclusions set forth in their supplemental report based upon visual inspections, measurements taken during supplemental and previous site visits, measurements made by other experts (including ultrasonic thickness measurements), original drawings and specifications, rehabilitation project drawings and specifications, analytical calculations using various construction standards, and a review of various reports, photos, and documentation produced in the discovery process, including the reports and depositions of Ports' experts.

Ports' first objection is that O'Leary and Garlich assumed the point they were trying to prove: namely, that distortion in walers used to support the dock wall occurred during the original construction of the wall.  To support this conclusion, Ports points to O'Leary's deposition testimony and Garlich's use of what Ports claims is the wrong load length variable in his calculations.  However, a review of O'Leary's deposition testimony in no way leads to Ports' position.  Moreover, Ports' contention that Garlich should have used a smaller load length variable is not a challenge to the methodology but to the correctness of the factual input, which can be highlighted on cross-examination during trial.

### #2, #3, #4 , #7  - Use of "cherry-picked" or less reliable data

Four of Ports' objections are rooted in O'Leary and Garlich's use of what it describes either as "cherry picked" or unreliable data and measurements, such as:  (1) the use of measurements and data from a section of the dock wall less than 550 feet long to reach their

supplemental conclusions regarding the entire wall (which spans almost 1,900 feet); (2) the use of measurements and data from sections of the dock wall which were partially disassembled in reaching their supplemental conclusions; (3) the comparison of dock wall alignment measurements between 2009 and 2010 to reach their supplemental conclusions instead of referring to measurements taken prior to and during the policy period; and (4) the failure to use additional relevant measurements in reaching their initial opinions.

At their depositions, O'Leary and Garlich explained the reasons why they selected certain data and measurements. Magistrate Judge Dinsmore clearly took that testimony into account when he determined the suitability and soundness of their methods in his order that thoroughly addressed each of the very similar objections posed by Ports. Further, Magistrate Judge Dinsmore made it clear that singling out factual data to challenge is an attack on the correctness of factual underpinnings, not methodology. In every circumstance raised by Ports, there was more data and analysis underlying the experts' methodology and conclusion than those portions which Ports found objectionable.

Additionally, Magistrate Judge Dinsmore considered additional circumstances that may have limited the abilities of O'Leary and Garlich to respond to assertions made by Ports' witnesses and experts. For example, the issue of the distortion in walers was first raised by Ports after the rehabilitation project was underway, and the access to the site and progress of the rehabilitation of the wall were outside of the control of Lexington's experts. Therefore, the Magistrate Judge did not allow such circumstances to be used to prevent Lexington's experts from responding to Ports' assertions with regard to evidence of damage. Also, the wall was

partially disassembled when Ports' own experts examined the walers; if Ports is to be believed, this would draw into question some of its own experts' measurements and conclusions as well.

In the end, Ports attempts to call into question the conclusions of Lexington's experts by placing undue focus on individual elements of factual input as opposed to attacking the reliability of their methodology. A methodology can be scientifically acceptable, even if the conclusions reached are subject to doubt due to input choices. *In re Zurn Pex Plumbing Products Liability Litigation,* 644 F.3d 604, 614-15 (8th Cir. 2011); *see also Smith,* 215 F.3d at 718. Such alleged flaws in input should be explored through vigorous cross-examination so that a jury can give the expert opinion its due weight, but these are not objections that cut to the general reliability of the methods employed by the experts. *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1345 (11th Cir. 2003). A trial court has considerable discretion in deciding whether to admit expert testimony where the factual basis is disputed. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999).

The Magistrate Judge was well within his discretion to find that O'Leary and Garlich should be allowed to testify, even if they used data that might be less relevant than the data Ports' experts used. The data and measurements challenged by Ports were clearly not the sole basis for the conclusions reached by Lexington' experts. Reliability and relevance can still exist even though the conclusions reached by an expert may be drawn into question by certain choices made during the course of employing his methodology. *See Tucker v. SmithKline Beecham,* 701 F. Supp. 2d 1040, 1056-57 (S.D. Ind. 2010). In short, the Court finds no clear error in the Magistrate Judge's order with respect to these four objections.

**#5 - Ports prejudiced by late disclosure of supplemental expert opinions**

Next, Ports asserts that the Magistrate Judge erred in his prejudice determination relating to the timing of O'Leary and Garlich's supplemental report.  Specifically, in his ruling, the Magistrate Judge found that the need for a supplemental investigation and report from Lexington's experts was prompted by Ports' August 2010 assertion that distortion found when the walers were uncovered was further evidence of damage.  Not allowing Lexington to respond in kind through expert analysis would have been prejudicial to the insurer.  While there may have been differences in opinion as to how cooperative Ports was with respect to allowing O'Leary to conduct his supplemental investigation at the times requested, there is no dispute that the supplemental report was completed less than three weeks after the final waler inspection, and that a Ports representative accompanied O'Leary at all times.  Ports had the opportunity to make the same measurements and assessments that O'Leary made during his visits to the site.  There is no clear error in the Magistrate Judge's conclusion with regard to the lack of prejudice in the timing of the supplemental expert report.

**#6 - Magistrate Judge mistakenly concluded that parametric stability analysis was to determine whether dock wall was designed correctly**

Ports contends that the computer stability analysis performed by each side's experts was intended to assess whether the dock wall suffered structural damage.  According to Ports, the Magistrate Judge erred by concluding that the analysis assessed "the stability of the wall system as designed."  To bolster this contention, Ports relies on the deposition testimony and report of its own expert, Robert Lukas, as well as the deposition testimony of Lexington's expert, Michael Garlich.

12

As an initial matter, it is unclear why the Magistrate Judge's supposed misinterpretation renders Lexington's experts' testimony inadmissible. Nonetheless, the Court respectfully disagrees with Ports' assessment of the conclusion to be drawn from the testimony and reports of the experts. The Court has reviewed the deposition testimony cited by Ports as well as Mr. Lukas' report. Having done so, the Court concludes that a fair interpretation of the evidence is that the parametric computer analysis assists in determining what conditions would need to exist for the dock wall to reach a failure level, not whether the dock wall is actually damaged or actually reached that failure level. Nothing in the Magistrate Judge's order would conflict with this conclusion. While the computer analysis may be a tool in assessing the damage, it is not the only tool relied upon by either side's experts and does not, in and of itself, measure damage to the wall. There is no clear error in the Magistrate Judge's order in that regard.

### #8 - O'Leary and Garlich are not qualified to offer opinions on dips, depressions and elevation changes

Finally, Ports challenges the Magistrate Judge's conclusion regarding O'Leary and Garlich's qualifications to testify with respect to the dips, depressions, and elevation changes in dock pavement that Ports contends have occurred (representing evidence of damage or imminent failure). While arguing that neither expert is qualified, Ports takes particular aim at Mr. Garlich who, at the time of his last deposition, had not reviewed any data or performed his own inspection of any alleged deformities in the pavement at the Ports dock. A review of his deposition testimony reveals that it is Garlich's opinion, based on experience, that there is nothing unusual about finding dips and depressions in dock pavement around the apron due to the heavy equipment that is often used, parked, and moved about the dock. Garlich's level of experience is certainly sufficient to allow him to testify to that simple conclusion. So long as his

13

testimony is limited to expressing his opinion based upon his own experience and not on some subsequent examination or analysis of the pavement in question, he is qualified to offer an opinion and the same does not prejudice Ports.

In its supporting brief, Ports offers no tangible reason for excluding O'Leary's testimony with respect to the pavement conditions.  Instead, Ports contends that Lexington does not explain how O'Leary's experience and qualifications make him qualified to offer opinions on dips, depressions, and elevation changes.  However, Ports does not question that O'Leary has the extensive experience with regard to design and inspection of docks and waterfront facilities. Plainly stated, the Court believes that O'Leary's experience qualifies him to opine on the significance of pavement deformities or irregularities on or near the dock apron.  Overall, there was no clear error in the Magistrate Judge's order denying Ports' Motion to Exclude Expert Testimony of O'Leary and Garlich.

**B.    Ports' and Lexington's Motions for Summary Judgment**

When faced with competing summary judgment motions, the court considers each party's motion individually to determine if that party has satisfied the summary judgment standard. *Kohl v. Ass'n. of Trial Lawyers of America*, 183 F.R.D. 475 (D. Md.1998).  Thus, in determining whether genuine and material factual disputes exist in this case, the parties' respective memoranda and supporting evidence are analyzed and all facts and reasonable inferences resolved and construed in a light most favorable to the respective non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  Finally, under Indiana law, the interpretation of an insurance policy is a question of law to be decided by the Court. *Cincinnati Ins. Co. v. Flanders Elec. Motor Service, Inc.,* 40 F.3d 146, 151 (7th Cir. 1994) (citation

14

omitted).   The Court will first address Ports' motion for summary judgment, followed by Lexington's motion for partial summary judgment.

      **1.**      <u>**Ports' Motion for Summary Judgment (Dkt. #64)**</u>

      **I.**      **Grant of Coverage and Exclusions in the Lexington policy**

Under Indiana law, the insured has the initial burden of proving coverage under an insurance policy. *Id*. (Citations omitted.)   Then, if an insurer relies on an exclusion within a policy to deny coverage, the insurer must establish that the exclusion applies *Id*. (citations omitted).  The perils insured by Lexington's policy are described generally within the policy as: "All risks of direct physical loss or damage to property described herein…."   The relevant exclusions to this general coverage are defined within the policy as follows:

> This policy does not insure against loss or damage caused by or resulting from:
>
> > A.  Inherent vice, gradual deterioration, ordinary wear and tear, unless a peril not otherwise excluded ensues and then this policy covers for loss or damage caused by the ensuing peril.
> > ….
> > D.  Normal settling, or shrinkage of walls, floors, or ceilings, evaporation, loss of weight, rust, corrosion, … unless a peril not otherwise excluded ensues and then this policy covers for loss or damage caused by the ensuing peril.
> >
> > E.  Errors in design, poor workmanship, or use of faulty materials unless physical loss or damage by a peril not otherwise excluded ensues, and then this company shall be liable for only such ensuing loss or damage.

Citing case law holding that "all risk" polices, like the one here, broadly cover all fortuitous losses not caused by misconduct or fraud, Ports contends that there is no question that the dock wall was damaged and that the damage was fortuitous. *See, e.g., Associated Aviation Underwrites v. George Koch Sons, Inc.,* 712 N.E.2d 1071, 1073 (Ind. Ct. App.1999).  Therefore, under this "all risk" policy, it is Lexington's burden to show that an exclusion applies.  "Not so

fast," Lexington replies.  Lexington contends that before it is faced with its burden of proving the applicability of an exclusion, Ports must prove that there was direct physical loss or damage to <u>every area of the dock that Ports is having repaired </u>and for which it seeks recovery under the policy.  The Court agrees.

Even with an "all risk" policy, an insured must prove that it has suffered a covered loss before the burden shifts to the insurer to show an exclusion.  *Pentair, Inc. v. American Guarantee and Liability Ins. Co.,* 400 F.3d 613, 615-16 (8th Cir. 2005).  With regard to the policy at issue in this lawsuit, that means that Ports must show a fortuitous "direct physical loss or damage" to the covered property in order to trigger coverage and force the insurer to prove the applicability of an exclusion.  "The requirement that there be direct physical loss or damage extends to the entire loss claimed." 5 Jeffrey E. Thomas, *New Appleman on Insurance Law Library Edition* § 42.02[3] (2010).  Indeed, it is certainly not unheard of for an insured to attempt to have the entirety of its property repaired when only a portion of it has been damaged.  *See Harbor House Condominium Ass'n v. Massachusetts Bay Ins. Co.*, 703 F. Supp. 1313 (N.D. Ill. 1988) (denying insured's claim under "all risk" policy for replacement of heating system because the fact that freeze damage occurred to a few pipes within the building's heating system was insufficient to attribute damage within the entire heating system to the same cause).

Here, the insured's property is a dock wall that is largely underwater.  Accordingly, the cosmetics and aesthetics of the property are not at issue (other than the apron area near Bollard #7 which Lexington agreed was covered).  Whether the dock wall is damaged is best assessed by determining if there is a quantifiable loss in the property's usefulness or in its function for normal purposes.  *Cf. Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.,* 311

F.3d 226, 235-36 (3d Cir. 2002); *see also* 10A Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 148:46, p. 148-80 (2005). Lexington has offered evidence to support a conclusion that, other than the section of the dock near Bollard #7, the dock did not suffer a loss to its usefulness or its ability to serve as a dock. As discussed above, that evidence includes expert testimony that the integrity of the dock wall was not compromised. And, tellingly, most of the allegedly damaged dock sections continued to be in active use at the port until those sections underwent rehabilitation. This evidence is sufficient to create a question of material fact as to whether the dock wall, outside of the section near Bollard #7, suffered direct physical damage or loss.

To clarify, the Court is not conflating usability with physical damage. As anyone who has driven a beat-up jalopy knows, a damaged piece of property can often still be used. However, where the damage is said to have reduced the ability of the property to safely function as a dock, and the insurance policy at issue excludes damage resulting from "… gradual deterioration, ordinary wear and tear, unless a peril otherwise excluded ensues…." and "[n]ormal settling, or shrinkage of walls … unless a perils [sic] not otherwise excluded ensues….," the court sees no ambiguity in the contractual intent. Ports needs to show that the dock wall suffered a fortuitous and cognizable reduction in its usefulness or that its ability to safely serve its purpose as a dock was compromised.

Because Lexington sold Ports an "all risk" policy, if Ports successfully proves a fortuitous physical loss or damage, the burden would typically shift to the insurer to show that an exclusion to coverage applied. The only exclusions invoked by Lexington are mentioned in the previous paragraph, all of which can be described as common forces or events that impact

17

property and are anticipated.[5]   These exclusions are essentially the antithesis of a "fortuitous

loss."   A fortuitous event is unexpected and not probable, one caused by an external force and

not the product of a natural or internal characteristic of the property.  *Schulz v. Erie Ins. Group*,

754 N.E.2d 971, 974 (Ind. Ct. App. 2001).   Therefore, if Ports meets its initial burden of

demonstrating fortuitous physical damage or loss, it has, for all practical purposes, negated any

application of the exclusions to coverage relied upon by Lexington.  The issue for a jury to

determine in this lawsuit is how much of the dock suffered "direct physical loss or damage" as a

result of the "perfect storm" of unexpected phenomena which Ports claims was visited upon the

dock by mother nature (as opposed to non-fortuitous and less extraordinary gradual deterioration,

ordinary wear and tear, or normal settling or shrinkage).   A proximate cause analysis is part of

this determination.

In *Hartford Cas. Ins. Co. v. Evansville Vanderburgh Public Library*, 860 N.E.2d 636

(Ind. Ct. App. 2007), the Indiana Court of Appeals adopted the "efficient proximate cause rule"

in parsing through the intent of the language of a similar all risk insurance policy.  Under the

Hartford all risk policy, a covered loss meant "loss caused by direct physical loss or damage to

covered Property within the policy period … unless the loss is excluded in the General Exclusion

or the Specific Exclusions."  *Id*. at 640-41.   After the general and specific exclusions were

identified in the Hartford policy, a provision entitled "Ensuing Loss Coverage" was included

which stated: "If physical loss or damage by a Covered Cause of Loss ensues, we will pay only

---

[5]In it's Fourth Affirmative Defenses, Lexington set forth three exclusions in its policy that "may" be applicable.
One of those was the exclusion that would deny recovery for damages due to "errors in design, poor workmanship,
or use of faulty materials ...."  However, Lexington's experts have opined that there was no fault in the dock wall
design and that distortion to certain steel "wales" that help secure the dock wall, which Ports contends is evidence of
damage, existed as a result of original construction and that the distortion does not confirm a failure or damage to
the integrity of the wall.  The Court finds no indication in Lexington's experts' reports or its briefing that suggests
that it is relying on the existence of faulty materials or workmanship to invoke exclusion to coverage.

for such ensuing loss or damage." *Id.* at 641.  In determining that the ensuing loss provision did

not apply, the court invoked the efficient proximate cause rule:

> The efficient proximate cause rule states that where a peril specifically insured
> against sets other causes into motion which, in an unbroken sequence, produce the
> result for which recovery is sought, the loss is covered, even though other events
> within the chain of causation are excluded from coverage. "Stated in another
> fashion, where an insured risk itself sets into operation a chain of causation in
> which the last step may have been an excepted risk, the excepted risk will not
> defeat recovery."

*Id.* at 646 (quoting *McDonald v. State Farm Fire and Cas. Co.*, 837 P.2d 1000, 1004 (Wash.

1992)).  The Indiana court went on to conclude:

> We are persuaded by the analysis and reasoning of efficient proximate cause rule
> in the interpretation and construction in policy language and believe that it serves
> the end of understandable and predictable coverage in the policy at issue here and
> all-risk policies, in general.

*Id.* at 647.

This Court is convinced that under Indiana law, the efficient proximate cause rule should

be applied to determine if Ports is entitled to coverage under Lexington's all risk policy for any

physical loss or damage it is able to prove with respect to each section of the dock wall it asserts

was damaged.  The bottom line is that Ports must prove the existence of damage that was

proximately caused by a fortuitous, and therefore covered, peril.  If it does so, it is entitled to

recover under the policy.  There would be no additional determination necessary with regard to

exclusions because the analysis for the asserted exclusions is consumed within the issue of

fortuitousness.  At this point, however, viewing the evidence in a light most favorable to the non-

moving party, no summary judgment in Ports' favor can be rendered.

## II.    Damages Valuation

Assuming for the moment that Ports is successful in its effort to prove fortuitous damage

to additional sections of the dock wall, the Lexington policy provides that such property "shall be valued at the replacement cost determined as of the date of replacement if actually replaced…." Notably, though, two design features are being implemented at the Burns Harbor Port as part of the dock wall replacement that were not included in the original dock: (1) the use of longer sheet piling; and (2) the installation of a drainage system behind the ground side of the wall to reduce ground water build-up. Ports and Lexington agree that these are prudent design changes, but Lexington maintains that these are improvements or component parts that were not a part of the insured property at the time of loss; therefore, the costs of these additions are not recoverable. According to Lexington, a bad event does not give the insured a blank check for an upgrade. If, for instance, a home without central air conditioning burns down, the homeowner is not allowed to add central air under a "replacement cost" homeowner's policy. Lexington argues that this reasoning applies with equal force to the costs of the drainage system and the longer sheeting.

Both Ports and Lexington cite to *Nahmias Realty, Inc.*, *v. Cohen*, 484 N.E.2d 617 (Ind. Ct. App. 1985), when discussing the measure of damages under replacement cost insurance. *Nahmias* involved an insured suing an insurance agency for the agency's failure to obtain the type of coverage the insured had asked it to procure for the insured's building. *Id.* at 619. The agency obtained a "replacement cost" endorsement on the policy but failed to insure the building in an amount sufficient to meet the requirements of the policy's co-insurance clause. *Id*. Importantly, the agency also failed to advise the insured that it could obtain code update coverage that would allow replacement or repair to conform with existing building code levels, even if such modifications were not in the building at the time of the loss and required additional expense to install. *Id.*

20

The *Nahmias* court found that the applicable measure of damages was the amount that would have been due under the policy that the agency should have obtained, plus any damages resulting from the agency's breach of duty to the insured.  *Id.* at 620.  In reaching its decision, the court noted that the cost of repair or replacement would likely exceed the actual value of the building.  *Id.* at 622.  In other words, by receiving replacement costs plus the costs of updating the building to existing code requirements, the insured would be in a better position than it was in prior to the loss.  *Id.* at 622.  However, the court noted that such a "windfall" is not objectionable because any insured that purchases replacement value insurance is bargaining for that potential, and the insurer will impound this expectation into the price of the policy. *Id.* Hence, the so-called windfall is nothing more than the benefit of the bargain.[6]  *Id.*

In the case at bar, there is no policy provision for replacement of the property at "existing code levels" or current design levels.  Nor is there evidence that the inclusion of a drainage system and the longer sheet piling were absolute engineering necessities to bring the dock wall to a functional level.  The experts have testified that the drainage system is recommended and desirable, but so too would be the addition of central air conditioning to a home that had none before it suffered a loss.

On the other hand, there is no requirement in the policy that the exact same materials be used when replacing a covered structure.  If, as Ports asserts, the same type of sheet piling is no longer available and the longer sheet piling is necessary to provide the same functionality to the dock that the original sheet piling provided, then Lexington would be required to pay for the longer sheet piling if Ports was successful in proving fortuitous damage.  Nevertheless, there is

---

[6]It should be noted that, in *Nahmias*, as in the other cases cited by Ports, the "windfall" was the increased value of the new structure in light of the age or depreciation of the older damaged one.  Therefore, the windfall is not the addition of features that make the structure more valuable, but the difference in value due to age.

insufficient evidence in the record to allow a conclusions to be drawn as a matter of law with regard to whether any particular section of the dock was fortuitously damaged and, if so, the extent of the rehabilitation and repairs performed that may have exceeded the replacement costs threshold. Accordingly, Ports' request for summary judgment as to the policy's coverage of the drainage system and longer sheet piling is denied. These are issues for the jury.

**2.      Lexington's Motion for Partial Summary Judgment (Dkt. #62)**

Lexington's Motion for Partial Summary Judgment hinges on the number of "occurrences" at issue. Specifically, recovery under the Lexington policy is limited to $10 million per occurrence, with a $50,000.00 deductible applicable to each occurrence. The policy has no aggregate limit. Assuming Ports proves that areas of the dock wall outside of the Bollard #7 area were damaged during the policy period, Lexington asks the Court to rule as a matter of law that the damage was the result of a single occurrence. According to Lexington, Ports initially claimed it was entitled to the $10 million in coverage available for a single occurrence. Later, though, Ports changed its tune, claiming that it was entitled to roughly $11.5 million in rehabilitation costs because the damage was the result of more than one occurrence. Tellingly, when Lexington asked Ports to provide the dates and details associated with each occurrence, Ports provided no such details.

Ports contends that all the experts agree that the damage to the dock wall occurred over the course of more than 72 hours and resulted from a combination of natural, as opposed to man-induced, events or conditions. Ports argues that because the per occurrence limitation language is ambiguous, it must be interpreted in the insured's favor, providing full coverage for all damages.

The "Occurrence Limit of Liability Endorsement" to the Lexington policy defines "occurrence" as follows:

> The term "occurrence" shall mean any one loss, disaster, casualty or series of losses, disasters, or casualties, arising out of one event. When the term applies to loss or losses from the perils of tornado, cyclone, hurricane, windstorm, hail, flood, earthquake, volcanic eruption, riot, riot attending a strike, civil commotion, vandalism and malicious mischief, or terrorism, one event shall be construed to be all losses arising during a continuous period of 72 hours. When filing proof of loss, the Insured may elect the moment at which the 72 hour period shall be deemed to have commenced, which may not be earlier than the time when the first loss to covered property occurs.

Contrary to Ports' contentions, this definition is unambiguous with respect to the current circumstances. This definition allows for an occurrence to be restricted to losses incurred within a 72 hour period when caused by certain specifically identified perils; however, none of those perils are involved in this case. Therefore, the part of the definition limiting an occurrence to those losses or series of losses that arise "out of one event" is the operative policy language.

The essence of Ports' case has always been that the unusually low water level of Lake Michigan over the course of weeks or months during the winter of 2007-2008 was the key factor which, in concert with other natural events, caused the damage to the dock wall. The low lake level was a continuous or ongoing event. The level did not rise and fall dramatically on a daily basis, but lowered over the course of a lengthy time period before rising over a similarly lengthy period of time. Damage incurred over the course of time as a result of the same event or chain of events has been interpreted by the courts to be the result of a single occurrence. *See, e.g.*, *Michaels v. Mutual Marine Office, Inc.*, 472 F. Supp. 26 (S.D.N.Y. 1979). Accordingly, the Court finds that the damages incurred were the result of a single occurrence and Lexington is entitled to summary judgment on this issue.

23

## IV. <u>CONCLUSION</u>

For the reasons set forth herein, Ports' Objections to and Appeal from Magistrate Judge's September 16, 2011 Order on Daubert Motions (Dkt. #158) is **DENIED**.  Ports' Motion for Summary Judgment (Dkt. #64) is **DENIED**.  And, Lexington's Motion for Partial Summary Judgment (Dkt. #62) is **GRANTED**.

SO ORDERED.

Date: _____
      11/14/2011

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana


DISTRIBUTION:

Jonathan K. Barger
BUTLER PAPPAS WEIHMULLER KATZ
CRAIG LLP
jbarger@butlerpappas.com

Brandi L. Bennett
ICE MILLER LLP
bennett@icemiller.com

Michael E. Brown
KIGHTLINGER & GRAY
mbrown@k-glaw.com

Victoria Redstone Calhoon
ICE MILLER LLP
victoria.calhoon@icemiller.com

Brent W. Huber
ICE MILLER LLP
brent.huber@icemiller.com

Ginny L. Peterson
KIGHTLINGER & GRAY
gpeterson@k-glaw.com

K. Clark Schirle
BUTLER PAPPAS WEIHMULLER KATZ
CRAIG LLP
cschirle@butlerpappas.com

Michael P. Sever
BUTLER PAPPAS WEIHMULLER KATZ
CRAIG LLP
msever@butlerpappas.com